[No. 2200.]

## EX PARTE J. T. O'CONNOR ET ALS.

HABEAS CORPUS—FACT CASE.—See the statement of the case for evidence in a habeas corpus proceeding for bail, under an indictment for murder *held* insufficient to authorize the refusal of bail.

HABEAS CORPUS on appeal from the District Court of Bexar. Tried below before the Hon. G. H. Noonan.

The appellants in this case, J. T. O'Connor, Abbie M. O'Connor and Mattie Collins, were held under a capias issued from the justice's court of precinct number one of Bexar county, Texas, on a charge against them of the murder of the infant child of the said Mattie Collins. They sought relief under the writ of habeas corpus, and bail being refused by the district judge, this appeal has been prosecuted to this court, and bail is awarded to each of the relators in the sum of two hundred and fifty dollars.

The evidence for the State was first introduced, and L. P. Weathers was the first witness. He testified that he was a physician and had been engaged in the practice of medicine for the period of twenty years. The witness was acquainted with Thomas (J. T.) O'Connor, his wife Abbie O'Connor, and Mattie Collins. He had known Thomas O'Connor about a year at the time of this trial, but could not recall the length of time that he had known Mrs. O'Connor. The witness knew Mattie Collins as Mrs. Smith, and as Mrs. Smith he attended her at Mrs. O'Connor's house late in October, 1886. Witness attended her for the three of four days succeeding the birth of her child. The child's general condition was very healthy. Mattie Collins was the natural mother of the child, and her ability to nurse the child was good. Witness saw Mattie Collins about two and a half

weeks after the birth of the child. He then went to collect his fee, and not in his professional capacity to attend upon either mother or child. One Joe Murray, acting ostensibly as the agent of some third party, employed the witness in the first instance, to attend Mattie Collins, and witness looked to Murray for his fee. Witness saw the child on the occasion of that visit. It looked much worse and smaller than when the witness first saw it. The witness never saw Mattie Collins nurse the child. The witness could not undertake to say what was the matter with the child, but he thought it evident that the child was suffering from the want of nourishment, though it might have been sick. The child looked very much reduced, and as if whatever nourishment it had taken had disagreed with it. This visit was paid by the witness late in November. The child, at birth, had every appearance of having been carried the full period. The probable result of placing a white child, two and a half weeks old, with a colored woman to nurse would be to cause its sickness and death. Mrs. O'Connor was present at the birth of Mattie Collins's child, and it was the recollection of the witness that Thomas O'Connor was about the house. Mrs. O'Connor never made a statement to the witness relative to the condition of the child.

On his cross examination the witness said that he made three or four professional visits to the house after the birth of the child, but he could not remember exactly how many. Mattie Collins had a large, well developed breast. When he went back to the house, two weeks after his professional services were discontinued, witness saw both mother and child, and asked how the latter was getting along. He then made no suggestions regarding the treatment of the child, nor did he make any inquiry about it other than the general one stated. He did not consider it his business to make suggestions with regard to the child, unless he was called upon professionally to do so. The mother was up, working about the house, and looked well and "hearty." Witness looked at the child, but made no examination of it. What he saw of it on that occasion would not warrant him, as an expert, to express an opinion of its condition. He did not know what produced the emaciated condition in which he found the child. Witness did not know the negro woman to whom his attention is now called by counsel, and had never seen her to his knowledge. Negro women make very good nurses for infants when under the supervision of whites. Witness had never

heard the name of the child. This occurred in Bexar county, Texas.

Doctor R. L. Graves testified, for the State, that he had been in the regular practice of medicine for forty-four years. Witness was present at the inquest held over the body of a child at the office of McAllister, the justice of the peace. Witness did not observe the gender of the child, but thought it to be about six weeks old at the time of its death. The appearance of the body was wasted and emaciated, and indicated that its death was produced by starvation or else by nourishment on bad milk. The witness was impressed with the idea that starvation was the immediate cause of the child's death, although it may have died from taking bad milk, or from some disease of the bowels produced by overfeeding. It is a fact that, at one time, about one-half the infants born in the cities of London and New York died from nourishment on impure milk. The child witness saw at McAllister's office had no "vividness" about its face or body, but looked as though it had wasted away gradually. The witness could not recall a single instance of the death of a child in the city of San Antonio, Bexar county, Texas, from imbibing impure milk. It was the opinion of the witness, as a physician, that nineteen out of twenty infants will die if given out to a negro woman to nurse, because few people, especially negroes, know how to feed infants on cow's milk. "The great emaciation would have to come on before the three or four days spoken of." An infant suffering from starvation would present the same appearance as one dying from mirasmus, which is the technical name for gradual wasting away. The removal of a five or six weeks old child from its mother would bring about the death of the child sooner if it had mirasmus than if it did not have that disease. The child inquired about in this case may have died from heart disease.

Clarissa Crawford was the next witness for the State. She testified that she lived in a small, dilapidated cedar house, in the bushes, above the beer brewery in San Antonio, Texas. The house had two rooms in it and is cold and exposed. Witness had no stove, but made her fire in a hole in the floor. Witness had been married about three years, and had been the mother of five children, one of them colored. All of witness's children are dead. One of them died in infancy, and one of them lived to young manhood, when he was shot and killed. Witness's husband worked on the side walks. The witness had known

Mrs. O'Connor for some time. She saw Mr. O'Connor the one time when he came to witness's house to bring the child involved in this investigation. Mrs. O'Connor came to the witness's house on the second Sunday before this trial for the first time in three years. She told witness that she wanted the witness to take care of a baby whose mother was dead. She did not mention the mother's name, though the witness asked it. She said that the child had been sick but was better. She agreed to pay witness eight dollars to pay for her trouble, and gave her two dollars with which to buy milk for the child. The witness agreed to keep the child a week. She brought the child, well wrapped in a shawl, and told witness not to unroll it, but to take it in and lay it down. The child was brought to witness on a dark Sunday night. As it was sleeping well the witness did not unwrap it, but took it to bed with her in her cot. It rested well until about four o'clock, when witness unwrapped it and found it so very poor and emaciated that she took the "trembles" and could not dress it. Witness was afraid to let the infant suck much, for it had every appearance of being starved, and there was great danger of over feeding it. Witness would not have taken the child had she seen it before Mrs. O'Connor went back home. The child's cheeks, legs, stomach and arms were drawn in, and its stomach was yellow. Witness fed it on sweetened milk from a bottle early on Monday morning, and it nursed like it was starved. The man with Mrs. O'Connor when the child was left with witness said nothing more than that he would soon be back. When they left they said nothing to witness about getting a doctor. They left an ample supply of clothing, including two flannel skirts and a shawl. They left two dollars for the purchase of milk, and witness got a quart of milk night and morning from Mrs. Smith, who lived near and kept a cow. The child drank about half a bottle of milk on Monday morning. It drank but little Monday night. It cried nearly all of Tuesday, and drank but little. The child slept well on Sunday night until it woke up, but slept little afterwards. Witness understood Mrs. Holmes to say that she was married to a Mr. Thompson, but doubtless was mistaken in the name. After the child died, witness got Mrs. Smith's sister to write a note to Mr. Nelson, signed "Mrs. Holmes and Mr. Thompson," telling him of the child's death.

On her cross examination the witness said that she was a good and experienced nurse for infants. Mrs. O'Connor knew the

witness as a good nurse. She was to pay the witness eight dollars per month for caring for the child, and she furnished her with two dollars to buy milk. She brought the child wrapped in a woolen shawl. She brought also a bottle of milk. A child sleeping without food from early evening until four o'clock in the morning, ought to nurse heartily. Babies, as a general rule, nurse heartily in the morning. The child was kept in the kitchen. The clothing furnished for the child was ample and sufficient. Witness had plenty of bedding, and her room, with the doors closed, was pleasant enough. The baby did not get cold. Witness was well prepared for the care of children, and this child was as well cared for as it could have been by any body. Her house was kept clean and tidy. Mrs. Holmes (evidently Mrs. O'Connor) knew that witness kept a clean house when she brought her the child. Mrs. Holmes told witness when she brought the baby where she lived, but witness had forgotten the address she gave. Mrs. Holmes brought the baby and Mr. O'Connor the clothes. Mrs. Holmes told witness that her husband was dead, and that she had married a Mr. Thompson. The baby was at witness's house two days and three nights before its death. Witness did not know upon what food Mrs. Smith fed her cow, but the cow ran at large during the day. The child was so poor that it was impossible for one to tell it was sick. It cried only after taking milk.

On redirect examination the witness said that she gave the milk furnished by Mrs. O'Connor when the child woke up at four o'clock, after she first got it. Mrs. Smith's cow's milk was given afterwards. The child was a female, but witness never heard its name called. It was in no condition to be taken from its mother when brought to witness. Witness could not leave with the child, and had no one to send for a doctor. Two gentlemen and a colored man had talked to witness about this matter. The colored man came to the house first. One of the white men told witness that he wanted her to tell the truth about this matter. The other did not enter witness's house. Witness left her home on the night before this trial, not because she was afraid to attend court; but because she had curious feelings.

Mrs. Bertha Dietler testified, for the State, that she lived on Victoria street, in the fourth ward of the city of San Antonio. She knew the three relators as Mr. and Mrs. O'Connor and Mrs. Smith. O'Connor rented the witness's house, which was near the residence of witness, and the three relators, with some chil-

dren and a baby, moved in on the sixth day of December, 1886. Witness never saw any men about the house. Witness saw that the baby looked sickly, and, on the day after the parties moved in, she asked Mrs. Smith (Mattie Collins) how the baby was. Mrs. Smith replied that it was a little sick, and that she was going to call in the doctor. Witness never saw a doctor about the house. Witness saw the baby take milk from a bottle, but never saw Mrs. Smith nurse it. Mrs. Smith said that the reason she did not nurse the baby was it was not her child. When she said this she smiled as in jest. Witness did not ask Mrs. Smith who the mother of the baby was. She saw no reason why Mrs. Smith did not nurse the child. Witness knew nothing about the removal of the child, more than that Mrs. O'Connor said that it had been taken to the Orphan's Home.

Cross examined, witness said that she saw milk administered to the baby from a bottle, and thought the milk was obtained from a goat kept in the yard. She knew nothing about Mrs. Smith's ability to nurse the child.

Mrs. Josephine Kingsley testified that she had license to practice medicine, and was connected with the San Antonio Orphan's Home. The witness had known Mr. and Mrs. O'Connor since their application for the admission of a child to the Orphan's Home. That application was made about two weeks before this trial by Mr. O'Connor, who said that the child was an orphan. The application was laid before the board, and witness was one of the committee appointed to receive the child if its orphanage and destitution should be established. Witness told O'Connor that the child, if in fact an orphan and destitute, would be received. O'Connor said that the child's name was Liola May Smith. He said that he knew the mother of the child to be dead, but was unable to say that its father was dead. O'Connor did claim relationship to the child, but said that it was brought to his wife to get a home for it, but that his wife had failed to find it a home. He did not say who brought the child to his wife. Mr. and Mrs. O'Connor together brought the child to the Home, and Mrs. O'Connor afterwards took it away. It was at the Home about a week, and was taken away on the second Friday before this investigation, because it was ascertained that its mother was still living and was not destitute. Witness saw O'Connor on Thursday evening, and told him that because of the discovery the child would have to be taken from the Home. A dark complected man of medium height, called Jones by O'Con-

nor, came with O'Connor on Friday. O'Connor appeared to be acting under Jones's orders, who said that the child would have to be taken away. Witness never afterwards saw Mr. O'Connor. She was unable to say whether or not she would know Jones if she were to see him. Witness never saw the mother of the child. When she went to demand the removal of the child from the Home, she left a note with O'Connor's landlady, telling O'Connor that she had discovered the facts about the child, and that if he did not attend to the matter the authorities would. The child was in a very bad condition when it left the Home. It was much wasted away. Its condition may have been the result of starvation or of disease. It did not show symptoms of disease, but was restless, trying and emaciated, the usual indications of starvation. Witness prescribed only wholesome food, and the matron of the Home reported slight improvement in the child's condition.

Cross examined, witness said that she could speak, of the child's improvement while at the Home, only upon the matron's report. While at the Home the child was fed on Mellen's food and cow's milk. Goat's milk was not used at the Home. Witness could not positively identify the man pointed out to her as the Mr. Jones who visited the Home with O'Connor. He resembles Jones somewhat.

L. S. Hodges testified, for the State, that he had known the O'Connors, husband and wife, since the early summer of 1886, and lived on the same place with them. Mattie Collins came to O'Connor's house, as Mrs. Smith, in May or June, and was evidently pregnant at that time, and was afterwards delivered of a child. O'Connor told witness that Mrs. Smith was an unfortunate woman who had been too intimate with her brother in law, and had come to his house to escape her troubles. He did not tell the witness who Mattie Collins's brother in law was. He never told witness that the mother of the child was not named Mrs. Smith. Witness frequently saw Mattie after she got up from child bed, but never had a talk with her about the child. Witness had seen men about the house, but did not know whom they came to see. Witness never saw the child while at O'Connor's house. Mattie worked laboriously, ironing most of the time. They milked a goat while they lived on the place with witness.

George H. Kalteyer testified, for the State, that he was a chemist and druggist. Witness analyzed some milk brought

to him by Sheriff Alexander, and pronounced it pure. It was admitted that the milk analyzed by Kalteyer came from the cow from which the milk was taken that was used by Clarissa Crawford. The State closed.

Doctor Graves, recalled by the relators, testified that, next to mother's milk, the milk of an ass, the milk of a mare, and the milk of a goat, in the order named, is best for infant's food.

Mrs. Hodges testified, for the relators, that she did not know any thing about the care of the baby, which she saw but once at O'Conner's. It was then about ten days old, and appeared to be healthy. Witness did not know how the O'Conners fed the child, but thought on milk from a bottle. Witness thought the O'Conners took good care of the child; in fact, she knew from what she saw and was told that the child had good care.

Mrs. Meyers testified, for the relators, that she saw the child at O'Conner's when it was about four days old. It looked well and healthy, and was apparently well cared for. It was comfortably clothed, and was kindly spoken of and handled by Mrs. O'Conner. Witness afterwards, when its mother had gotten up, saw the baby. Its mother said it was then sick. It was well and carefully wrapped. All the parties seemed attached to the child. Witness was unable to say whether or not Mrs. Smith was able to nurse the child.

*J. A. & N. O. Green, T. J. Ponton* and *A. S. Chevalier*, for the relators: The proof must show that the applicants deliberately and willfully starved the child to death. (Am. Crim. Defenses, vol. 4, p. 105; Desty's Am. Crim. Law, secs. 57*a* and 124*e*; Bishop's Crim. Law, vol. 1, sec. 883; Roscoe's Crim. Ev., 3 Am. ed., p. 721; Taylor's Med. Jur., 8 Am. ed., p. 646.) The last authority says: "A new born child kept long without food will die, and no evidence of the fact may be derivable from an examination of the body. There may be no marks of violence externally, nor any pathological changes internally, to account for death. This is a rare form of murder, except as it may be accidentally combined with exposure to cold. *In order to convict the mother, it is necessary to show that the child was willfully kept without food, with the criminal design of destroying it.* Mere neglect or imprudence will not make the case infanticide. The only appearance likely to be found on an examination of the body would be complete emptiness of the alimentary canal. Without corroborative circumstantial evidence, this would not suffice to

establish the cause of death; a medical witness could only form a probable conjecture on the point. In a suspected case of this kind, the contents of the stomach should be tested for farinaceous and other kinds of food."

If it was lawful for Mattie Collins to raise the child upon goat's and cow's milk, at the Orphans' Home, and under the care of an experienced nurse, so that she might conceal from the public her disgrace and loss of chastity, then the case before the court is, at most, only negligent homicide. (Penal Code, Arts. 579 and 580.)

The facts showing murder are overbalanced by the facts showing innocence.

Criminating facts:

1. Illegitimate child, healthy when born.

2. Mother refuses to nurse it, though able to do so.

3. Two and one half weeks after birth, child looked smaller to Doctor Weathers, and it might have been starved; he could not say.

4. Child is placed at the Orphans' Home and then in the hands of a nurse.

5. Taking a child two weeks and a half after birth, and putting it in the hands of a colored woman for nursing, is dangerous.

6. After death the child looked as if it had been starved.

7. O'Connor and wife told Clarissa Crawford not to unwrap the child when they carried it to her.

8. When Clarissa unwrapped the child it looked starved.

9. Mattie Collins said the reason she did not nurse the baby was because it was not hers, and smiled as in fun.

These are submitted as all the facts that would show the least guilt in law.

Exculpatory facts:

1. Mattie Collins became the mother of an illegitimate child by her brother in law.

2. She came to San Antonio in May or June, 1886, "to be relieved of her trouble," and assumed the name of Mrs. Smith.

3. A physician was called on October 28 to deliver her of the child.

4. She did not nurse it from her breast (in order that she might not be known to the world as a mother).

5. She procured a goat, kept it tied at the house, and gave the

child milk from the bottle. Goat's milk proved to be excellent for babes.

6. Mrs. Myers and Mrs. Hodges, who lived in the immediate neighborhood, thought that they (applicants) were much interested in the child's welfare, and took good care of it.

7. In order that the child might have good care, and at the same time that she might be able to appear before the community, her friends and relatives as a virtuous woman, a place for the infant is obtained at the Orphan's Home by a subterfuge of O'Connor and Mr. Jones.

8. When the deception is discovered, the child is taken away from the Home by O'Connor, and put under the care of Clarissa Crawford, who was a good nurse. He furnishes her with sufficient food, clothing and money for the present necessities of the child, and she is promised eight dollars per month for its care in future.

9. The testimony of the medical experts is as follows: Doctor Weathers, who called two and a half weeks after the birth of the child, says: "I saw the child the day I called. It looked smaller and worse. I never saw the mother nurse it. *I could not say what was the matter with it.* I thought it was evidently suffering from want of nourishment, *or it might have been sick.* It looked very much reduced, *as though what it had taken had not agreed with it.*" * * *

Cross examined: "*I could not say that my examination would warrant me in giving an expert's opinion,* but simply tell what would naturally be thought. *I can not tell what caused this emaciation.*"

Doctor R. L. Graves said: "The child had wasted away as though it was starved to death, *or from being nourished on bad milk.* I concluded it was starved to death, *but am not certain; it may have been caused by bad milk, or over fed, and died from some disease of the bowels.* * * * It looked as though it had wasted gradually away. * * * An infant suffering from starvation would have the same appearance of dying from mirasmus (marasmus), which is a gradual wasting away."

We submit that the facts show that the woman Mattie Collins was doing all in her power to accomplish two purposes—

1. The saving of her own reputation; and

2. The preservation of the child's life in the best possible manner consistent with the circumstances by which she was surrounded.

We can find no criminal design in the acts of O'Connor and wife.

In conclusion we ask the court to discharge the applicants, since there is not sufficient evidence to hold them, and since no indictment has been found. It seems to us that those who have the power to grant bail can also go the full length and discharge applicants upon such evidence as is presented in this record.

*J. H. Burts*, Assistant Attorney General, for the State.

WHITE, PRESIDING JUDGE. In this case the judgment of the court below refusing bail to applicants on the habeas corpus hearing is reversed, because, as shown by the testimony here exhibited, it is not, in our opinion, "evident" that they are guilty of murder of the first degree, if, indeed, the said evidence establishes with any degree of certainty a crime of any kind committed by them. There is an agreement in the record as to their ability to give bail in the sum of one thousand dollars each. We will fix the amount of the bonds for each at the sum of two hundred and fifty ($250) dollars, and upon the execution of a bond by each of said applicants in said sum, with approved security, conditioned as the law requires, the sheriff of Bexar county will release them from confinement in jail.

The judgment is reversed and bail is granted applicants in the sum of two hundred and fifty dollars each.

*Ordered accordingly.*